IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEBORAH ANN NARDELLA          :
                              :        CIVIL ACTION
                   v.         :        NO. 09-5629
                              :
PHILADELPHIA GAS WORKS, ET AL.   :


**SURRICK, J.**                              **JANUARY   30   , 2014**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendant Philadelphia Gas Works's Motion for Summary

Judgment.  (ECF No. 42.)  For the following reasons, the Motion will be granted.

**I.      BACKGROUND**

   **A.      Procedural Background**

Plaintiff Deborah Ann Nardella filed a grievance with the federal Equal Employment

Opportunity Commission ("EEOC"), and received a Notice of Right to Sue in September 2009.

(Am. Compl. Ex. 1, ECF No. 12.)[1]  On November 25, 2009, Plaintiff filed a Complaint in this

Court.  The case was assigned to the Honorable Mitchell Goldberg.  Judge Goldberg addressed a

Motion to Dismiss Plaintiff's Complaint, dismissing several counts and granting Plaintiff leave to

file an amended complaint.  (Order on Mot. to Dismiss, ECF No. 11.)  Judge Goldberg concluded

that Counts II, III, IV, V, and VI of the Complaint failed to state a claim.  (Mem. on Mot. to

_____

   [1] Plaintiff also claims that she filed a complaint with the Pennsylvania Human Relations
Commission ("PHRC").  (Am. Compl. ¶ 216.)  The PHRC did not find evidence of
discrimination and advised Plaintiff to consult an attorney or file a complaint in the Court of
Common Pleas.  (*Id*. at ¶¶ 220-23.)  Plaintiff does not seek relief under the Pennsylvania Human
Relations Act, 43 Pa. Cons. Stat. §§ 951, *et seq*.

Dismiss, ECF No. 10.)  Plaintiff filed the Amended Complaint on July 26, 2010.  (ECF. No. 12.)

Defendant Philadelphia Gas Works ("PGW")  filed a partial motion to dismiss on August 25,

2010, seeking to dismiss Counts II, III, IV, V, and VI of the Amended Complaint.  (ECF. No. 14.)

Ultimately, Judge Goldberg recused and the case was reassigned to this Court.  (Order

Reassigning Case, ECF No. 30.)

On April 3, 2012, we granted Defendant's motion in part and denied it in part.  (*See* Mem.

on Motion to Dismiss, ECF No. 31; Order on Motion to Dismiss, ECF No. 32.)  We granted

Defendant's motion with regard to Count V (ridicule, harassment, and psychological harassment)

and Count VI (violation of the Equal Pay Act of 1963).  (*Id.*)  We denied Defendant's motion with

regard to Count II (reverse racial discrimination in violation of Title VII of the Civil Rights Act of

1964), Count III (hostile work environment based on Plaintiff's gender), and Count IV (hostile

work environment based on Plaintiff's race).  (*Id.*)

On October 13, 2012, Defendant filed the instant Motion for Summary Judgment on the

remaining claims.  (Def.'s Mot., ECF No. 42.)  Plaintiff filed a *pro se* response opposing summary

judgment on November 5, 2012.  (Pl.'s Resp., ECF No. 46.)[2]

### B.    Factual Background

Plaintiff was hired by PGW on April 7, 2003, to work as a Secretarial Assistant 2 in the

Customer Service Department.  (Ex. A, Def.'s Ex. List, ECF No. 43.)  Plaintiff worked for the

Director of Labor, Thomas Murphy until February of 2006.  (Ex. U, Def.'s Ex. List.)  As of

January 1, 2003, PGW operated under an Anti-Harassment/Sexual Harassment policy that

---

[2] Plaintiff is proceeding *pro se* in this matter.  It is "the Court's duty to construe pro se complaints liberally."  *McKeithan v. Cox*, No. 90-6148, 1991 WL 157376, at *1 n.1 (E.D. Pa. Aug. 7, 1991).

provides that "[a]ll employees and managers have a clear responsibility to do all that is necessary to maintain a work environment that is free of racial, ethnic heritage, disability, sexual orientation, religious or sexual harassment or intimidation."  (Ex. I, Def.'s Ex. List.)

1.    *Evaluations Under Murphy*[3]

During the course of her employment, Plaintiff was evaluated on several occasions.  On September 1, 2004, Murphy completed a Union Exempt Employee Annual Performance Appraisal for Plaintiff evaluating her performance from September of 2003 through September of 2004. (Ex. M, Def.'s Ex. List.)  Plaintiff received a middle rating of 3 for her competency in each category and an overall rating of 3 as an "employee whose performance meets expectations."  (*Id.*) Plaintiff was reviewed again on August 25, 2005 for her performance from September 1, 2004 to August 31, 2005.  (Ex. L, Def.'s Ex. List.)  Plaintiff once again received a middle rating of 3 for her competency in each category and an overall performance rating of 3.29 as a "proficient" employee who "consistently meets and sometimes exceeds all relevant performance standards." (Ex. L.)  On August 25, 2005, Plaintiff received an inter-office memorandum from PGW informing her of a $1,560.91 salary increase effective September 3, 2005.  (Ex. K, Def.'s Ex. List.)  The next day, Plaintiff wrote a response thanking Murphy for the review and for her salary increase, but indicating that she was disappointed in the amount of the pay increase.  (Ex. L.)

_____

[3]  We note at the outset that in its Memorandum in Support of the Motion for Summary Judgment, Defendant spends a lot of time focusing on Plaintiff's testimony regarding her "hearing voices."  (Def.'s Mot. 4-9, 21-22)  In fact, Plaintiff did so testify.  Nevertheless, this testimony does not assist the court in assessing the validity of Plaintiff's claims.

2.    *Evaluations Under Jordon*

In February of 2006, Plaintiff began reporting to Steven Jordon, a black male who had recently taken the position as Director of Labor.  (Ex. U; Def.'s Statement of Facts ¶ 43, ECF No. 42; Jordon Dep. 6, Def.'s Dep. Trs., ECF No. 44.)  Jordon completed an appraisal for Plaintiff for the period of September 1, 2005 through August 31, 2006.  (Ex. S, Def.'s Ex. List.)  The overall performance rating for this period was 2.25.  (*Id.*)  The appraisal comment read:  "[Plaintiff] seems to have a good attitude, however, there seems to be some continuous miscommunication regarding standards, requirements processes and the overall expectations and requirements."  (*Id.*)  As a result, Plaintiff was placed on a performance improvement plan ("PIP").  (*Id.*; Ex. J, Def.'s Ex. List.)  Plaintiff filed a written response to the appraisal stating that "these comments are slanderous to my performance and the statements [sic] pure LIBEL and I do not appreciate someone making statements about my work that isn't [sic] true, especially robbing me from my raise in the process."  (Ex. S.)  Plaintiff said that she was "appalled" by the comments in the review, lamented PGW's decision not to give her a raise, and indicated that she believed she was being discriminated against for a reason that was not known to her.  (*Id.*)

3.    *Plaintiff is Placed on PIPs*

The PIP contained goals for Plaintiff to achieve by the end of a ninety-day period.  (Ex. J.)  Among other things, Plaintiff was to "[p]repare and produce all meeting contacts and minutes grammatically and factually correct [sic]."  (*Id.*)  Plaintiff refused to sign the PIP.  (*Id.*)  The PIP reflected that after the thirty-day reassessment, on December 18, 2006, Plaintiff was making progress.  (*Id.*)  On December 18, 2006, Plaintiff met with Jordon and Gary Gioiso, Director for Organizational Development at PGW, in Jordon's office for a thirty-day review of her PIP.  (Ex.

4

R, Def.'s Ex. List.)[4]  Notes from that meeting reflect that Jordon told Plaintiff "that he was happy with the progress she was making" but that "[t]hroughout the conversation, [Plaintiff] appeared defensive.  She continued to question the PIP and [Jordon's] authority to evaluate her performance."  (Ex. R.)  During the meeting, Plaintiff pointed at Jordon and referred to him in the third person.  (*Id.*)  Plaintiff was warned that such behavior was unprofessional.  (*Id.*)  After sixty days, the PIP reflected that Plaintiff was once again making progress.  (*Id.*)  After ninety days, during the final assessment of Plaintiff's employment performance while on the PIP, Jordon indicated that Plaintiff achieved the required improvement and could be re-evaluated at a future date.  (*Id.*)

PGW completed another Union Exempt Annual Performance Appraisal reviewing Plaintiff's competency for the period of September 1, 2006 through August 31, 2007.  (Ex. P, Def.'s Ex. List.)  Plaintiff's overall performance rating was a 2.59.  (*Id.*)  The appraisal reflected that Plaintiff's performance needed improvement as she consistently fell short of performance standards.  (*Id.*)  Plaintiff signed the appraisal acknowledging that she read it, but wrote on the appraisal that she did not agree with several areas of the review and included objections under separate cover.  (*Id.*)  On November 9, 2007, Plaintiff was placed on her second PIP.  (*Id.*)

By way of an interoffice memorandum on November 13, 2007, Plaintiff addressed her

---

[4] In Defendant's Statement of Facts, this meeting is alleged to have taken place on December 18, 2007.  (*See* Def.'s Statement of Facts ¶ 50).  Plaintiff maintains that this meeting occurred on December 18, 2006.  (Pl.'s Statement of Facts ¶ 50, ECF No. 45.)  Plaintiff claims that she could not have attended a meeting on December 18, 2007, as she was out of work at that time recovering from a slip and fall, which resulted in a fractured spine.  (*Id.*)  We observe that the notes in question reflect a date stamp of December 18, 2006.  (*See* Ex. R.)  In determining when this meeting occurred, we rely on Plaintiff's representation and the date reflected on the document.

objections to the performance review.  (Ex. Q, Def.'s Ex. List.)  In the memorandum, Plaintiff

objected to numerous characterizations in the appraisal and cited specific interactions that she

thinks might have caused her low ratings.  (*Id.*)  Ultimately, Plaintiff requested that all of the "2"

ratings be removed from her evaluation.  (*Id.*)  She attributed the low ratings to discrimination

resulting from her having applied for two higher paying positions on November 2, 2007 and wrote

that she believed that PGW was preventing her from progressing within the company.  (*Id.*)

>              4.      *Plaintiff's Internal Complaint*

On November 7, 2007, Eloise Carnall, an employee at PGW who sat outside Jordon's

office and near Plaintiff, overheard a loud exchange between Plaintiff and Jordon.  (Carnall Dep.

6, Def.'s Dep. Trs.)  Carnall could not hear what Jordon was saying, but observed that he was

speaking to Plaintiff in an escalated tone of voice.  (Carnall Dep. 7.)  On November 16, 2007,

Plaintiff filed a complaint with PGW.  (Ex. N, Def.'s Ex. List.)  Plaintiff claimed that she was

enduring mistreatment because of her gender and that it began after she raised a question about

her high gas bills.  (*Id.*)  Plaintiff also noted that she believed her applying for other positions was

upsetting other people.  (*Id.*)  On December 11, 2007, Gioioso replied to Plaintiff by letter.  (Ex.

O, Def.'s Ex. List.)  Gioioso wrote that Plaintiff's gender had no bearing on her being placed on a

performance improvement plan, observing that many males have been placed on similar plans.

(*Id.*)  The letter acknowledged Plaintiff's questioning of her high gas bills and her applications for

other jobs and emphasized that "[t]he issue was and remains your work performance . . . Your

supervisor needs more support from the position . . . Please be aware that if your performance

does not improve, your employment may be terminated, at any time."  (*Id.*)  Ultimately, PGW

found Plaintiff's claim of discrimination or harassment due to gender to be unfounded.  (*Id.*)

On May 5, 2008, Jordon e-mailed Plaintiff regarding a union contact Jerome Ross. (Def.'s Statement of Facts ¶¶ 53-54; Ex. G, Def.'s Ex. List.) Jordon said that there were several problems with the contact, including listing incorrect attendees for the meeting and seemingly using old correspondence from previous meetings while overlooking data that should have been deleted. (*Id.*) Jordon informed Plaintiff that he noticed issues with the minutes of the Availability meeting and that he was concerned about giving the appearance that they did not know what they were doing. (*Id.*) Jordon asked Plaintiff to meet with him. (*Id.*) Attached to the e-mail were the minutes prepared by Plaintiff and edited by Jordon which Jordon advised were now ready to go out. (*Id.*)

On June 26, 2008, Gioioso wrote a letter to Plaintiff informing her that her employment with PGW was terminated effective immediately. (Ex. A; Ex. D, Def.'s Ex. List.) The letter said that Plaintiff's employment was terminated "because PGW does not have confidence in your judgment or ability to perform in your present position." (Ex. D.) The letter referenced minutes prepared by Plaintiff for the union contact regarding Jerome Ross, which listed an attendee who was not present at the meeting. (*Id.*) Gioioso also claimed that there were significant errors in minutes prepared by Plaintiff for the Availability meeting. (*Id.*) Finally, Gioioso wrote that despite having worked with Jordon for over two years, Plaintiff continued to misspell his name in reports and other documents. (*Id.*) Jordon was dissatisfied with Plaintiff's job performance, as he felt that she had challenges keeping up with the pressure of a fast-paced environment with many things going on at once. (Jordon Dep. 51.) Specifically, Jordon felt that Plaintiff struggled to provide clear concise summaries of conversations, which, in his view, could leave PGW exposed in arbitration or union negotiations. (*Id.*)

7

     5.    *Jordon's Secretaries After Plaintiff*

After Plaintiff's employment was terminated, Jordon had a white female as his secretary. (*Id.* at 53.)  She did not last very long in the position.  (*Id.*)  After the white female secretary, Jordon had several African-American females as secretaries, none of whom lasted very long in the position.  (*Id.*)

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . .");  *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue

for trial.'" *Id.* at 587 (citations omitted).  When deciding a motion for summary judgment, courts

must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477

U.S. at 255.  Courts must not resolve factual disputes or make credibility determinations.  *Siegel*

*v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    DISCUSSION

As noted above, Defendant seeks dismissal of the remaining counts in Plaintiff's

Complaint:  (1) Count I, which alleges a violation of Title VII of the Civil Rights Act of 1964[5];

(2) Count II, which alleges reverse racial discrimination in violation of Title VII; (3) Count III,

which alleges that Defendant created a hostile work environment for Plaintiff based on her

gender; (4) Count IV, which alleges that Defendant created a hostile work environment based on

Plaintiff's race; and (5) Count VII, which alleges retaliation based on Plaintiff's gender in

violation of Title VII.

### A.      Counts I and II: Violation of Title VII

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination against

"any individual" based on that individual's "race, color, religion, sex, or national origin."  42

U.S.C. § 2000e-2(a).  Title VII makes it unlawful to discriminate against a woman based on her

gender.  *Johnston v. City of Phila.*, 863 F. Supp. 231, 233 (E.D. Pa. 1994).  In addition, the

dictates of Title VII "are not limited to discrimination against members of any particular race . . .

---

[5] Defendant contends that Count I "appears to be a statement of facts lacking a cognizable cause of action."  (Def.'s Mot. 17.)  We disagree.  *Pro se* litigants such as Plaintiff are held to "less stringent standards" than trained counsel, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), and the Court is to "apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name."  *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003) (citing *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002)).  Plaintiff has articulated a cause of action under Title VII for discrimination based on her gender which we will address *infra*.

[Title VII] proscribe[s] racial discrimination in private employment against Whites on the same terms as racial discrimination against nonwhites." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976).  The Third Circuit permits a white plaintiff to advance a claim of racial discrimination even though they are not a member of a racial minority.  *Kondrat v. Aschcroft*, 167 F. Supp. 2d 831, 835 (E.D. Pa. 2001).  With regard to Plaintiff's claim of reverse discrimination by her African-American supervisor, she must "present sufficient evidence to allow a fact finder to conclude that [the defendant] is treating some people less favorably than others based upon a trait that is protected under Title VII."  *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999).

Plaintiff alleges discrimination based on her gender (female) and reverse discrimination based on her race (white).  The analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to both claims.  To make a *prima facie* case of discrimination or reverse discrimination, a plaintiff must establish that they are a member of a protected class, that they were qualified for the position they sought to retain, that they suffered an adverse employment action, and that the adverse employment action occurred under circumstances which could give rise to an inference of intentional discrimination.  *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant can articulate such a reason, the burden returns to the plaintiff who must then show that the defendant's stated reason for the adverse employment action was a mere pretext for intentional discrimination.  *Id.* at 804.

In the context of a motion for summary judgment, a non-moving plaintiff must provide

evidence, which:  "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication"; or 2) permits the factfinder to reasonably conclude "that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).  In large part, the burden-shifting analysis of *McDonnell Douglas* is in place "to eliminate the most obvious, lawful reasons for the defendant's action (i.e., the position that an applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually taken, etc.)." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).  "Notwithstanding this burden shifting framework, at all times, the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains with plaintiff." *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 512 (E.D. Pa. 2010).

Even though we construe Plaintiff's pleadings liberally, a *pro se* plaintiff "still has before [her] the formidable task of avoiding summary judgment by producing evidence 'such that a reasonable jury could return a verdict for [her].'" *Zilich v. Lucht*, 981 F.2d 694, 696 (3d Cir. 1992) (quoting *Anderson*, 477 U.S. at 242).  We observe that in opposing summary judgment, "a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

Plaintiff offers a number of grievances about the way she was treated by her supervisor at PGW.  Specifically, Plaintiff claims that Jordon "downplay[ed] [Plaintiff's] role as a secretary . . . kept constantly accusing [her] of mistakes that, in a lot of instances, [she] didn't even make . . . ."

11

(Second Nardella Dep. 66, Def.'s Dep. Trs.)  Plaintiff claims that she sent out minutes for a meeting, which were later edited with incorrect information.  (*Id.*)  Plaintiff was later blamed for these mistakes, which she claims were not her doing.  (*Id.*)  Plaintiff insists that Jordon constantly found problems with Plaintiff's work, making minor changes to drafts of documents and accusing Plaintiff of writing in an unclear manner.  (*Id.* at 67.)  At one point, the position of Administrative Coordinator advertised that there was an opening.  (*Id.* at 70.)  Plaintiff was deterred from applying for the position because the listing mentioned a requirement of extensive training in a vendor payment platform called Oracle Financial ("Oracle").  (*Id.*; Keaton Dep. 19, Def.'s Dep. Trs.)  The job ended up going to a coworker, John Keaton, who Plaintiff contends did not have extensive training in Oracle.  (Second Nardella Dep. 70.)  Plaintiff contends that when she confronted Jordon about this issue, Jordon "flipped out" and questioned why Plaintiff would challenge her co-worker's experience.  (*Id.* at 70-71.)

Plaintiff also felt that other interactions with Jordon reflected his mistreatment of her, including:  (1) forcing Plaintiff to reorganize documents that were part of a class action lawsuit (*id.* at 71, 73); (2) giving Plaintiff problems about taking training computer classes, including making her write justifications for the classes when others did not have to do so (*id.* at 73-74); (3) yelling at Plaintiff that "[he] [didn't] think [Plaintiff] want[s] to be here" upon learning that she had applied for two higher paying jobs (*id.* at 64); (4) criticizing Plaintiff for allowing an employee to withdraw a grievance (*id.* at 40, 75); and, most importantly; (5) putting Plaintiff on PIPs so that she could not advance within PGW (*id.* at 96).  Plaintiff also alleges that Gioioso contributed to a hostile work environment by telling her she could only apply for certain secretarial positions within PGW.  (*Id.* at 91-92.)  Despite Gioioso's admonitions, Plaintiff

12

applied for two other non-secretarial positions.  (*Id.*)   She was not interviewed for the positions because she was then on her second PIP.  (*Id.* at 94-95.)  Plaintiff did not get either job and could not say whether she was more or less qualified than those who ultimately did.  (*Id.* at 94.)

　　　　While Plaintiff has established that she is a member of a protected class, that she was qualified for the position of secretary at PGW, and that she suffered an adverse employment action when her employment was terminated by PGW, the record does not reflect that the adverse employment action occurred under circumstances which could give rise to an inference of intentional discrimination.  Plaintiff has put forth no evidence to support her assertion that the mistreatment that she allegedly endured was motivated by her race or gender.  Plaintiff concedes that she never heard Jordon make any derogatory comments about white people.  (First Nardella Dep. 129, Def.'s Dep. Trs.)[6]  Plaintiff also could not recall Jordon saying anything offensive to women.  (Second Nardella Dep. 82-83.)  Moreover, Plaintiff never heard of Jordon saying anything offensive to another individual about white people or women.  (*Id.* at 86.)  With regard to similarly situated PGW employees, Eloise Carnall, a white female who worked in an office outside Jordon's office was such an employee.  Plaintiff was not aware of Jordon mistreating Eloise Carnall.  (*Id.* at 85.)  Although, it may have been, as Plaintiff contends, that Jordon "couldn't stand [Plaintiff]," (*id.* at 83), personal animosity does not sustain a claim of discrimination or reverse discrimination.  Moreover, the fact that Jordon may have been a difficult and demanding boss does not support Plaintiff's claims of discrimination.

─────────────

　　　　[6] At her deposition, Plaintiff alluded to overhearing Jordon mumble something like "I hate white people.  That's why I hate white people."  (First Nardella Dep. 129.)  However, Plaintiff expressed a lack of confidence in her understanding of what she may have heard and, just moments later in her deposition, she noted that she didn't "want to really put it on record."  (*Id.*)

Even if one were to find that Plaintiff had satisfied her burden in establishing a *prima facie* case of discrimination, Defendant has provided sufficient evidence to establish a legitimate, non-pretextual justification for the termination of Plaintiff's employment.  Jordon said that he was dissatisfied with Plaintiff's job performance.  He felt that she could not keep up with the pressure of a fast-paced environment with many things going on at once.  (Jordon Dep. 51.)  Jordon felt that Plaintiff struggled to provide clear concise summaries of conversations, which, in his view, could leave PGW exposed in arbitration or union negotiations.  (*Id.*)  This justification for the termination of Plaintiff's employment is legitimate and the burden shifts back to Plaintiff "to submit evidence from which a fact finder could reasonably:  (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Washco v. Fed. Express Corp.*, 402 F. Supp. 2d 547, 561 (E.D. Pa. 2005).  Despite Plaintiff's refutations of her performance appraisals, which began as average and progressed to below-average, she has not established that Defendant's justification for the termination of her employment was pretextual nor has she set forth any evidence undermining Defendant's justification for the termination of her employment.

Finally, we observe that the employee who replaced Plaintiff was a white woman followed by several African American women.  All of these women met the same fate as Plaintiff.  (Jordon Dep. 53.)  Plaintiff cannot establish that "someone in a non-protected class, otherwise similarly situated, was treated more favorably."  *Anderson v. Haverford College*, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802 & n.13).  Plaintiff has not established that there is any genuine issue of material fact with regard to either of her claims–

gender discrimination and reverse discrimination based on race–under Title VII.

**B.      Counts III and IV: Hostile Work Environment**

The Third Circuit advises that a plaintiff may establish a claim of a hostile work environment under Title VII by proving that:  (1) the employee suffered intentional discrimination based on a protected characteristic (including their gender or race); (2) the discrimination was pervasive and regular; (3) the employee was detrimentally affected by the discrimination; (4) the discrimination would have detrimentally affected a reasonable person in the employee's position; and (5) *respondeat superior* liability is appropriate.  *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  In determining whether a workplace was a hostile environment under Title VII, courts consider several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 F. App'x 132, 140 (3d Cir. 2012) (quoting *Harris*, 510 U.S. at 23).

However, "[o]ffhand comments[] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990) ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere.").  Because

15

"Title VII . . . does not set forth a general civility code for the American workplace," *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted), the statute does not protect against all workplace difficulties, including crass and unwarranted behavior, *Saidu-Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436, 439 (E.D. Pa. 2001).

Plaintiff maintains that she was the victim of intentional discrimination based on her gender and race and that the discrimination was severe and persistent enough to deny her raises and eventually result in the termination of her employment.  (Pl.'s Resp. 9.)  Plaintiff argues that "[she] feels that she was slowly being pushed out of her position because Defendant felt more comfortable around African-American females . . . ."  (*Id.* at 10.)  In fact, Plaintiff undermines her claim of gender discrimination and a hostile work environment for women when she argues that her supervisor, Jordon, felt more comfortable around African-American woman.  Moreover, Plaintiff's arguments constitute nothing more than speculation and accusation.  While Plaintiff goes to great lengths to prove that she was a model secretary and that any and all issues with the preparation of meeting minutes were not caused by her performance, she has not established that Defendant, PGW, created a hostile work environment based on her race or gender.[7]  Plaintiff also discusses, at length, a number of unpleasant conversations with Jordon, where he spoke to her in a hostile tone, questioned her desire to work in his department, and was subjected to scrutiny about her desire to take additional training courses.  (Pl.'s Resp. 12, 14, 16.)  Once again, Plaintiff has

---

[7] With regard to an incident during which Jordon "flipped out," Plaintiff does not establish that the motivation for this unpleasant interaction was race or gender based.  Moreover, the incident related to the promotion of Plaintiff's colleague, John Keaton.  (Pl.'s Resp. 10.) Plaintiff acknowledges that Keaton "is a very nice person and a pleasure to work with."  (*Id.*) Under the circumstances, we cannot conclude that such a promotion or that an unpleasant encounter surrounding the promotion was at all evidence of pervasive racial or gender-based discrimination.

16

not established a nexus between these encounters and any discriminatory animus on the part of anyone at PGW.  Plaintiff argues that her being denied raises in 2007 and 2008 while on PIPs "could [ ] be the result of being Caucasian and discriminated against."  (*Id.* at 22.)  It could also be the result of Jordon's dissatisfaction with Plaintiff's attitude and her performance.  At the summary judgment stage, speculation cannot sustain claims of discrimination.  There are no genuine issues of material fact with regard to Plaintiff's claims of a hostile work environment.

### C.    Count VII: Retaliation

Under Title VII, a plaintiff can establish a *prima facie* case of retaliation by proving that: "'(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'"  *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  Title VII protects employees who oppose discrimination prohibited by the statute and who proceed against the employer's conduct.  *Slagle v. Cnty of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006).

If a plaintiff makes out a prima facie case, the burden shifts to the employer to advance a legitimate, non-retaliatory justification for the adverse employment action.  *Krouse*, 126 F.3d at 500.  "The employer's burden at this stage is 'relatively light:  it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action].'"  *Id.* at 500-01 (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)).  If the employer satisfies this low burden, the plaintiff then must convince the factfinder that the proffered explanation was false and that the real motivation for the adverse employment action was retaliation.  *Id.* at 501.

17

Plaintiff bases her retaliation claim on a series of events in November of 2007. Plaintiff claims that she was removed from her first PIP on November 2, 2007 and that she applied for two other positions–Attendance Investigator and Attendance Manager–with PGW. (Pl.'s Resp. 52.) On November 6, 2007, Jordon and Plaintiff had an unpleasant encounter during which Jordon hollered at Plaintiff. (Pl.'s Resp. 53.) Plaintiff went to Gioioso, asked for a transfer, and informed him of her job applications within PGW. (*Id.*) Gioioso informed Plaintiff that she could apply for other secretarial positions, but that she did not qualify for the two positions for which she had already applied. (*Id.*) Plaintiff was uncomfortable with this interaction. (*Id.*) Plaintiff contends that she was placed on another PIP just four days later. (*Id.*) On November 13, 2007, Plaintiff received a negative performance evaluation. (Ex. P.)

In an interoffice memorandum on November 13, 2007, Plaintiff challenged characterizations in the performance review, cited specific interactions that she thought caused the low ratings, and attributed the ratings to discrimination resulting from her having applied for higher-paying positions on November 2, 2007. (Ex. Q.) On November 16, 2007, Plaintiff filed a complaint with PGW. (Ex. N.) In her complaint, Plaintiff claimed that she was enduring mistreatment because of her gender which began after she questioned her high gas bills in writing, and she noted that she believed her applying for other jobs was upsetting other people. (*Id.*) On December 11, 2007, Gioioso replied to Plaintiff by letter. (Ex. O.) Gioioso wrote that Plaintiff's gender had no bearing on her being placed on a PIP, observing that many males have been placed on similar plans, and acknowledging that "[t]he issue was and remains your work performance." (*Id.*)

In the retaliation context, an "adverse action" is one that "well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Davis v. City of Newark*, 285 F. App'x 899, 904 (3d Cir. 2008) (quoting *White*, 548 U.S. at 68).  Examples of adverse employment actions in the retaliation context include "undesirable reassignment, demotion, or discharge." *Alers v. City of Phila.*, 919 F. Supp. 2d 528, 547 (E.D. Pa. 2013).

Plaintiff has not made out a *prima facie* case of retaliation under Title VII.[8]

Plaintiff engaged in protected activity (responding to the performance appraisal and filing a Complaint within PGW) and we will assume that she suffered an adverse employment action.[9]  In a retaliation case, "a plaintiff may rely upon a broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).  However, Plaintiff has not established any causal connection between the activity and the adverse employment action aside from temporal proximity.  While temporal proximity can be the basis for a causal link between protected activity and retaliation, *Woodson*, 109 F.3d at 920, here, the proximity between the events, standing alone, does not support a finding of causation.  *See Krouse*, 126 F.3d at 503; *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 415 (E.D. Pa. 2000) (finding that six-month gap between protected activity and transfer did not establish causation in a retaliation claim).  Other than personal feelings of mistreatment and suppositions regarding her supervisor's motive, Plaintiff has not directed the Court's attention to any facts on the record indicating a causal connection between

---

[8] Even assuming Plaintiff's chronology and recounting of events, these events underscore why Plaintiff cannot sustain her claims of discrimination, reverse discrimination, or a hostile work environment under Title VII.  In November of 2007, as reflected in her memorandum, Plaintiff attributed discrimination she was encountering to her having applied for two higher-paying jobs on November 2, 2007, not to her race or gender.

[9] Plaintiff's possible grounds for an adverse employment action are:  (1) being placed on a second PIP; (2) not receiving either of the two jobs for which she applied; and (3) having her employment terminated seven months after this series of events.

her protected activity and any alleged retaliatory action.  *See Aguiar v. Morgan Corp.*, 27 F. App'x 110, 112 (3d Cir. 2002) (finding that plaintiff failed to present sufficient evidence of a causal connection between internal report to human relations and firing eight months later when plaintiff received positive reviews in the interim).  "Causation of retaliation may be adduced through evidence that illustrates both (1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period, but timing alone will not support a finding of causation unless unusually suggestive." *Alers*, 919 F. Supp. 2d at 548 (internal quotation marks and citations omitted).  Even if one were to assume that there was a temporal proximity here, which there is not, there is no record of a pattern of antagonism to sustain a finding of causation.  Plaintiff's claims of antagonism are speculative and cannot sustain her cause of action for retaliation.

Finally, even if Plaintiff had established a *prima facie* case of retaliation, we find, as discussed above, that Defendant has established a legitimate, non-retaliatory reason for the termination of Plaintiff's employment.  Plaintiff received negative performance appraisals, seemingly improved when placed on a first PIP, received another negative performance appraisal resulting in a second PIP, and later had her employment terminated following mistakes made in the creation of documents for external distribution.  Defendant claims that such mistakes were indicative of Plaintiff's broader performance.  To rebut Defendant's claim and survive a motion for summary judgment on her retaliation claim, Plaintiff must produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action."  *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996).  Plaintiff has not done so.  Accordingly, Plaintiff's claim of

retaliation under Title VII must fail.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Philadelphia Gas Works' Motion for Summary

Judgment will be granted.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**

21